# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

HEAVY PETROLEUM PARTNERS, LLC,
and CHEROKEE WELLS, LLC,

    *Plaintiffs*,

vs.

PAUL ATKINS, an individual, and J.J.R. OF KANSAS LIMITED,

    *Defendants*.

Case No. 09-1077-EFM

## MEMORANDUM AND ORDER

This case involves a dispute between Plaintiffs Heavy Petroleum Partners, LLC (HPP) and Cherokee Wells, LLC and Defendants Paul Atkins and J.J.R. of Kansas Limited (JJR). In 2006, HPP and JJR entered into a farmout agreement in which HPP was given the opportunity to earn an assignment of 75% of JJR's interest in an oil and gas lease. The agreement contemplated HPP injecting steam into existing wells for the purpose of producing oil in commercial qualities. The initial test pod appeared as if it was going to be successful.

JJR assigned its interest to HPP in August of 2006. In early 2009, Atkins filed documents with the Kansas Corporation Commission naming himself as the operator of the lease. HPP contends that Atkins and JJR breached the contractual agreements between the parties.

Before the Court is Plaintiffs' Motion for Summary Judgment as to Counts I, II, III, IV, and parts of Count VII of their First Amended Complaint and as to liability on all counterclaims asserted by Defendants (Doc. 45). The motion has been fully briefed. For the following reasons, the Court grants the motion.

## I. Facts and Procedural Background

In 1988, JJR's predecessor in interest, KLM Exploration Company, Inc., took an oil and gas lease from John and Sandra Zacharia covering the north half of the southeast quarter and the southwest quarter of Section 9, Township 9 South, Range 20 East, in Jefferson County, Kansas (the Lease). The Lease covered approximately 240 acres. Through various assignments, JJR succeeded to the lessee's interest in the Lease. The Lease is underlain by the McLouth sandstone, a petroleum reservoir containing a very dense, heavy crude oil.

On May 19, 2006, JJR and HPP entered into a farmout agreement (the Farmout) in which HPP was given the opportunity to earn 75% of JJR's working interest in the Lease. In order to earn an assignment of that interest, the Farmout required HPP to rework certain wells and/or drill additional wells as necessary to develop a test pod of wells with the goal of using underground steam injection to heat the heavy oil and increase its production from the Lease. If HPP was successful at developing a test pod that would produce oil in commercial quantities, the Farmout obligated JJR to assign to HPP a 75% working interest in the Lease.

Pursuant to Paragraph 5 of the Farmout, any assignment given thereunder was to expressly be made "subject to the reservations and conditions contained" in the Farmout. The Farmout also provided that if HPP earned an assignment, JJR was to retain a minimum of ten barrels per day of production from the Lease.

The Farmout specified a procedure to be followed in the event HPP violated the provisions of the agreement. These provisions included that JJR would provide written notice of the violation by certified mail with 30 days to cure. Only if HPP failed to cure the violation within the 30-day period would JJR be entitled to terminate the Farmout and require HPP to reassign any interests previously conveyed to it under the terms of the Farmout. The Farmout included an A.A.P.L. Form 610-1989 Model Form Operating Agreement, often referred to as a joint operating agreement (JOA). The JOA designated Blue Jay Operating as the Operator of the Lease.

Among the relationships between the parties governed by the Farmout and the JOA, Paul Atkins, owner of JJR, agreed to serve as a "professional consultant" on the Lease. Atkins attended to the day-to-day operations and maintenance of the wells and other equipment on the Lease so that the parties would not incur additional operating expenses to hire a pumper.

HPP undertook the development of the test pod and by August 2006, the test pod was capable of producing in paying quantities.[1] However, steam injection into the test pod of wells did not commence until sometime after October 6, 2006, when the Kansas Corporation Commission (KCC) approved the permit to commence injection.

---

[1] In Plaintiffs' first Complaint and Amended Complaint, Plaintiffs allege that HPP promptly undertook development of the test pod and by July 2006, the test pod was producing in paying quantities. Defendant Atkins directs the Court's attention to the complaints to demonstrate the inconsistency between the complaints and the facts stated in support of the motion for summary judgment.
    Plaintiffs' attorney filed an affidavit with Plaintiffs' reply in which he states at the time he prepared the complaint, he reconstructed a timeline of the events and he incorrectly assumed that as of the date of the assignment, the test pod was capable of producing in commercial quantities. At that time, he believed this event was only a background fact and not material to the issues. In his haste to get the original complaint filed, he did not investigate the fact any further. When the amended complaint was filed, he did not revisit the allegation.
    Atkins contends that the July 2006 date is the correct date, but the oil was produced conventionally and not due to steam injection. However, there is no citation to the record for support of this fact nor was this fact contained in his affidavit. As such, the Court will rely on the August 2006 date.

On August 23, 2006, JJR executed an assignment (the Assignment) to HPP of 75% of the working interest in the Lease. The Assignment did not contain language making its duration subject to the Farmout and did not contain language making it otherwise subject to the Farmout. The Assignment also did not contain a reservation of the ten barrels per day contemplated by the Farmout. It was given an effective date of May 19, 2006 (the same date as the Farmout), and it was recorded at Book 685, Page 646 of the official records of Jefferson County, Kansas.

By letters dated August 29, 2006 and November 13, 2007, HPP and JJR made amendments to the Farmout and JOA, and otherwise acknowledged continued vitality of those agreements. One of the August 29, 2006 amendments eliminated one sentence in Paragraph 5 of the Farmout Agreement and inserted an additional sentence. The amendment deleted the following sentence: "Accordingly, only the oil production exceeding the said 10-barrels per day shall be covered by this agreement and all revenues from the said 10-barrels per day shall be paid to Farmoutor." The following sentence was substituted: "Taking the current production level into account and in fairness to Farmoutor, the parties agree during the first full year of production under the Farmout Agreement, Farmoutor's share of production shall not be less than 10 barrels of oil per day." Atkins received his ten barrels through the end of the first year of production.

On November 8, 2006, Plaintiffs commenced efforts to develop the second pod of wells when they applied to the KCC for an injection permit on the Zachariah 2-90 well, which was to be the injection well for Pod 2. Pod 2 did not require the drilling of additional wells, and the only actions necessary to develop Pod 2 were to convert the 2-90 to an injection well and obtain KCC approval to commence injection.

On December 31, 2006, Blue Jay Operating assigned all its rights and interests as operator of the Lease to plaintiff Cherokee Wells. The JOA gave the operator "full control of all operations" on the Lease and provided that the operator could be "removed only for good cause by the affirmative vote of Non-Operators owning a majority interest" in the Lease. The JOA also provided that non-operators would be given reasonable access to the Lease, but that "[s]uch access rights shall not be exercised in a manner interfering with the Operator's conduct of an operation" under the JOA.

In January 2007, plaintiffs commenced the conversion process on the 2-90 by pulling the rods, downhole pump and tubing from the 2-90. They also replaced the well head and ran new tubing and a packer into the well. Due to the KCC's delays in processing the injection application, the required mechanical integrity test for the 2-90 could not be attempted until May 2007. This pressure integrity test failed, and plaintiffs performed additional work on the 2-90. On June 6, 2007, the 2-90 passed its mechanical integrity test, and injection through the 2-90 commenced sometime shortly thereafter.[2]

On November 13, 2007, the parties amended the Farmout and that amendment indefinitely suspended the development obligations previously contained in paragraph 6 of the Farmout.

Early in January 2009, plaintiffs noted diminished oil sales from the Lease for the month of December 2008 and directed Atkins to concentrate on increasing production for the coming months. This deficiency appeared to have been corrected when Atkins sold 300 barrels of oil from the Lease during the month of January 2009.

---

[2]Apparently, the KCC did not actually approve the application until March of 2009. This is discussed in more detail below.

On January 26, 2009, Atkins filed an affidavit of non-production regarding the Lease in the official records of Jefferson County, Kansas. In this sworn affidavit, Atkins stated that "there is at present no production of oil or gas in commercial quantities at this time and secondary recovery attempts have failed. Assignment and farmout agreement authorizing said assignment has expired by its own terms."

On or about February 5, 2009, Atkins filed a "Request for Change of Operator" with the KCC designating JJR as the operator of the Lease. In support of that form, Atkins appears to have attached the same affidavit he filed with the KCC on January 26, 2009. As a result of Atkins' affidavit filed with the KCC, the Commission approved the change of operator and cancelled a pending application for enhanced injection authorization that Cherokee Wells had filed with respect to the Lease.

After Atkins filed his affidavit with the KCC, he also contacted Coffeyville Resources, the crude oil purchaser, asking that the lease ownership be changed to reflect JJR as the operator and the owner of 100% of the working interest in the Lease. As a result, Coffeyville Resources changed its records to reflect that JJR was once again the operator of the Lease. The crude oil purchaser takes its instructions regarding oil purchases from the entity or person whom the purchaser recognizes as the lease operator.

In early March 2009, HPP noticed that there were no oil sales from the Lease for the month of February. As a result, HPP sent field personnel to the Lease to investigate the causes of reduced production. HPP personnel found that the wells on the Lease had been shut-in, and that steam

injection on the Lease had also been stopped.[3] HPP personnel spoke with Atkins, who admitted that he had shut the wells in and turned off the steam generators.[4] Atkins also stated that he did not want any more work done on the Zachariah wells because he could not afford his share of the costs and expenses, and because he thought the plaintiffs were simply trying to run up operating costs to put him out of business.

On March 25, 2009, Plaintiffs filed their original complaint. They also filed a motion for a temporary restraining order and preliminary injunction. As an inducement to Plaintiffs to withdraw their motion for temporary restraining order and preliminary injunction, Plaintiffs and Defendants entered into an agreement (the Standstill Agreement) the terms of which required Defendants to cease all efforts to interfere with operation of the Lease during the pendency of this litigation.

After this case was filed with the District Court, Cherokee Wells notified the KCC of the underlying dispute. On March 25, 2009, the KCC approved the November 8, 2006 application for the injection permit that had been cancelled when Atkins filed his affidavit.[5]

---

[3]Plaintiffs attached the electricity records for the pumps from December, 2008 through September, 2009 with their reply brief. These indicate that most of the wells pumped almost continuously until approximately March 13th and 14th.

[4]Although Atkins disputes this statement in his response, there is no citation to the record and his affidavit attached to his response does not address this fact. Furthermore, in Atkins' first Answer to the Complaint, he admitted that he had shut the wells since there was no one to operate the Lease and also admitted the steam generators had been turned off, but that was at Plaintiffs' direction.

[5]When Atkins filed the Change of Operator form with the KCC on February 5, 2009, the KCC sent him a letter stating that the injection permit "was never approved by the UIC department. Unapproved injection applications cannot be transferred to a new operator if the lease is sold during the application process. The new operator, JJR of Kansas Limited must file a new application if you wish to use this well for injection purposes. Injection without written authority is a significant violation and may result in a monetary penalty, a license review, or both."
Plaintiffs admit that the injection through the 2-90 that occurred shortly after June 6, 2007 was a "technical violation of KCC regulations because the KCC had not officially issued an injection permit for the 2-90." Plaintiffs state that this was a result of an administrative mix-up. As noted above, the permit was issued on March 25, 2009, and Plaintiffs state that no effort has been made to penalize Plaintiffs over the issue.

In his deposition, Atkins testified that HPP never satisfied the requirements for earning an assignment under the Farmout. When asked to admit that HPP had earned an assignment, defendant denied same. Defendants state that HPP never earned an assignment under the Farmout. Defendants admit that HPP established production of oil in commercial qualities from the test pod by conventional means and also admit that HPP established the test pod as a facility capable of producing oil in commercial quantities. Defendants maintain that in order to earn and keep its assignment in the Lease, HPP was required to develop a test pod that was capable of producing oil in commercial quantities solely due to steam injection.

The Lease has produced in commercial quantities since Plaintiffs took over lease operations. Revenues generated by oil sales from the Lease have consistently exceeded operating expenses since Plaintiffs took over operation of the Lease.[6] Production under HPP's management appears to have increased in levels from Atkins' management.[7]

Plaintiffs filed their motion for summary judgment on October 23, 2009. Defendants filed their response, and at the same time, filed a motion for leave to file an amended counterclaim to include several fraud claims. The Court denied Defendants' motion for leave to file an amended counterclaim finding that the claims would be futile. With respect to Defendants' alleged fraud claims, the Court stated that they were conclusory and lack the specificity required by Fed. R. Civ. P. 9(b) and therefore would not survive a motion to dismiss for failure to state a claim.

---

[6] It appears that the profit on the Zachariah lease is as follows: 10-06 to 9-07: $212, 894.18; 10-07 to 9-08: $361,826.55; 10-08 to 9-09: $22,484.79.

[7] The Court notes that production went up significantly from 2006 to 2007. 2007 saw the highest production of any year since 1993 and was more than triple the volume produced by the Lease during any year Defendants managed operations.
There has also been a substantial decrease from 2007 to 2009. However, the chart indicates that 2009 data is incomplete, and there was a period in 2009 when the wells were shut-in.

On May 17, 2010, Plaintiffs filed a motion for a temporary restraining order and preliminary injunction alleging that Defendants had violated the Standstill Agreement the parties had entered into on April 16, 2009 because Defendants had interfered with the operations. A hearing was held on May 20, 2010. The Court granted Plaintiffs' motion and issued a temporary restraining order and preliminary injunction.

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that "there is no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law."[8] "An issue of fact is 'genuine' if the evidence allows a reasonable jury to resolve the issue either way."[9] A fact is "material" when "it is essential to the proper disposition of the claim."[10] The court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party.[11]

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.[12] In attempting to meet this standard, the moving party need not disprove the nonmoving party's claim; rather, the movant must simply point out the lack of evidence on an essential element of the nonmoving party's claim.[13]

---

[8] Fed. R. Civ. P. 56(c).

[9] *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[10] *Id.*

[11] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[12] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

[13] *Id.* (citing *Celotex*, 477 U.S. at 325.)

If the moving party carries its initial burden, the party opposing summary judgment cannot rest on the pleadings but must bring forth "specific facts showing a genuine issue for trial."[14] The opposing party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[15] Conclusory allegations alone cannot defeat a properly supported motion for summary judgment.[16] The nonmovant's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."[17] The Court is also cognizant that it may not make credibility determinations or weigh the evidence when examining the underlying facts of the case.[18]

The required rules for summary judgment motions in the District of Kansas are set forth in D. Kan. Rule 56.1. Under that rule, "[a]ll material facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party."[19] D. Kan. Rule 56.1(b) addresses opposing motions for summary judgment. It states:

> **(b) Opposing Memorandum**
> (1) A memorandum in opposition to a motion for summary judgment shall begin with a section that contains a concise statement of material facts as to which the party contends a genuine issue exists. Each fact in dispute shall be numbered by paragraph, shall refer with particularity to those portions of the record upon which the opposing party relies, and, if applicable, shall state the number of movant's fact

---

[14]*Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[15]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000)(citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

[16]*White v. York Int'l Corp.*, 45 F.3d 357, 363 (10th Cir. 1995).

[17]*Bones v. Honeywell Intern, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[18]*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

[19]D. Kan. Rule 56.1(a).

that is disputed.

(2) If the party opposing summary judgment relies on any facts not contained in movant's memorandum, that party shall set forth each additional fact in a separately numbered paragraph, supported by references to the record, in the manner required by subsection (a), above. All material facts set forth in this statement of the non-moving party shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the reply of the moving party.

"[I]t is the duty of the parties contesting a motion for summary judgment to direct the court to those places in the record where evidence exists to support their positions."[20] The Court will not sift through the record in an attempt to find a genuine issue of material fact or locate arguments for the parties.[21] It is the party's responsibility to tie the facts to its legal contention.[22] "Without a specific reference, 'we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury.'"[23]

## III. Analysis

Plaintiffs and Defendants bring several claims in this case. The primary issue, however, is who owns the disputed 75% working interest in the Lease. Plaintiffs contend that they own the disputed interest because (1) the assignment from JJR to HPP is, on its face, unconditional; (2) if the Court does not find it unconditional, the Farmout does not require HPP to continue to produce oil in commercial quantities as a result of steam injection in order to maintain HPP's interest in the

---

[20]*Boldridge v. Tyson Foods, Inc.,* 2007 WL 1299197, at *2 (D. Kan. May 2, 2007) (citing *Caffree v. Lundahl*, 143 Fed. Appx. 102, 106 (10th Cir. 2005) and *SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1513-14 (10th Cir. 1990) (stating that not only will the court not sift through the record to find support for an argument, the court will not manufacture arguments for the party)).

[21]*Boldridge*, 2007 WL 1299197, at *2; *see also Cross v. The Home Depot*, 390 F.3d 1283, 1291 (10th Cir. 2004).

[22]*Boldridge*, 2007 WL 1299197, at *2 (citation omitted).

[23]*Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995) (citations omitted). *See also United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

lease; and (3) even if there was a requirement of commercial quantities due to steam injection, JJR waived this requirement. In addition, Plaintiffs assert that should the Court have to determine Defendants' allegations that Plaintiffs breached the contract, a review of the alleged breaches shows that they are frivolous and do not give rise to a forfeiture of HPP's interest.

Defendants state that (1) if the assignment is unconditional, it was fraudulently induced; (2) the Farmout requires HPP to continue to produce oil in commercial quantities as a result of steam injection in order to maintain HPP's interest in the lease; (3) JJR did not waive any requirements of HPP; and (4) the Plaintiffs breached the agreement which resulted in the automatic reassignment of the lease to JJR.

### A. Quiet Title Claim (Plaintiffs' Count II; All of Defendants' Counterclaims)

Plaintiffs contend that they were given an assignment of an unconditional grant of 75% of the working interest in Defendants' oil and gas lease. A federal court sitting in diversity will apply the substantive rules of the forum state.[24] K.S.A. § 60-1002(a) provides that "[a]n action may be brought by any person claiming title or interest in personal or real property, including oil and gas leases, mineral or royalty interests, against any person who claims an estate or interest therein adverse to him or her, for the purpose of determining such adverse claim."

"Under Kansas law, construction of a written contract is a matter of law for the Court."[25] "The primary rule for interpreting contracts is to ascertain the parties' intent."[26] "Where a contract

---

[24]*Gerdes v. Am. Family Mut. Ins. Co.*, 2010 WL 2025208, at *4 (D. Kan. May 20, 2010) (citing *Blackhawk-Central City Sanitation Dist. v. Am. Guarantee & Liability Ins. Co.*, 214 F.3d 1183, 1888 (10th Cir. 2000). The parties do not dispute that Kansas law applies.

[25]*Befort v. Kansas*, 2009 WL 1379377, at *3 (D. Kan. May 18, 2009) (citing *Wagnon v. Slawson Exploration Co. Inc.*, 255 Kan. 500, 511, 874 P.2d 659 (1994)).

[26]*Carrothers Constr. Co., L.L.C. v. City of S. Hutchinson*, 288 Kan. 743, 751, 207 P.3d 231, 239 (2009).

is complete and unambiguous on its face, the Court must determine the parties' intent from the four corners of the document, without regard to extrinsic or parol evidence."[27]

Whether an instrument is ambiguous is also a question of law for the Court.[28] "Ambiguity in a contract does not appear until two or more meanings can be construed from the contract provisions."[29] "When a contract is not ambiguous, the Court may not rewrite a contract to achieve an equitable result under the guise of contract construction."[30]

Here, the assignment from JJR to HPP is unambiguous. The document contains no language making it contingent on any conditions and contains no language reserving JJR's right to terminate the interest. There are no conditions in the assignment related to the Farmout agreement. In short, the assignment unambiguously states that JJR assigns 75% of JJR's interest in the Lease to HPP. There is no language suggesting that it is anything other than an absolute assignment of JJR's interest.

Defendants contend that although the document is unambiguous, it was signed due to fraudulent inducement.[31] Defendants, however, did not raise the affirmative defense of fraud in their answers to Plaintiff's complaints. Federal Rule of Civil Procedure 8(c)(1) requires a party to affirmatively state fraud as an affirmative defense in responding to a complaint.

---

[27]*Befort*, 2009 WL 1379377, at *3 (citing *Simon v. Nat'l Farmers Org.*, 250 Kan. 676, 679-80, 829 P.2d 884 (1992)).

[28]*Id.* at *4 (citing *Simon*, 250 Kan. at 680, 829 P.2d 884).

[29]*Carrothers*, 228 Kan. at 751, 207 P.2d at 239.

[30]*Befort*, 2009 WL 1379377, at *4 (citing *Quenzer v. Quenzer*, 255 Kan. 83, 85, 587 P.2d 880 (1978) and *Patrons Mut. Ins. Ass'n v. Harmon*, 240 Kan. 707, 713, 732 P.2d 741 (1987)).

[31]The Court notes that many of Defendants' factual contentions are not supported because either Defendants fail to cite to the record or do not provide the Court with the record.

Defendants also did not bring a fraud claim in their original counterclaim. Although Defendants filed a motion for leave to amend their counterclaim to include several claims of fraud, the Court denied their motion finding that the claims would be futile. Specifically, the Court stated that Plaintiffs' fraud claims were conclusory and lacked the specificity required by Fed. R. Civ. P. 9(b) and therefore would not survive a motion to dismiss for failure to state a claim. As such, Defendants' allegation of fraud or fraudulent inducement is not properly before the Court, and the Court will not consider Defendants' claims of fraud.

Defendants additionally assert that the Farmout controls the assignment and that the assignment is subject to the terms and conditions contained in the Farmout. The Court cannot agree as the assignment contains no language making it subject to the Farmout. With respect to ownership of the disputed interest, it is governed by the assignment.

Applying Kansas law, because the language of the document is unambiguous, the document must be enforced as written. HPP was given an unconditional assignment of 75% percent of the working interest in the Lease. Accordingly, title lies with HPP, and Plaintiffs are granted summary judgment on their quiet title claim. Because all of Defendants' counterclaims are based on the notion that Plaintiffs' interest in the leasehold terminated, the Court grants Plaintiffs' motion for summary judgment as to Defendants' counterclaims because Plaintiffs' counterclaims are moot.

**B. Breach of Contract Claims (Counts I, III, and IV)**

Plaintiffs state that once the Court quiets title to the disputed interest in HPP, Plaintiffs become entitled to summary judgment on their breach of contract claims because there is no dispute as to any material fact. With respect to ownership of the disputed interest, it is governed by the assignment. As the Court has already determined, title lies with HPP. With respect to the

obligations of the parties, their obligations are governed by the Farmout and the JOA attached to the Farmout.

Plaintiffs allege in Count I that Defendants breached the contract by interfering with the operations of the Lease. The JOA gave Cherokee Wells, the operator, "full control of all operations" on the Lease. Defendants, as non-operators of the Lease, were given reasonable access to the Lease, but these access rights were not to be exercised in a manner that interfered with the operator's conduct of an operation. The JOA also provided that the operator could only be removed "for good cause by the affirmative vote of Non-Operators owning a majority interest" in the Lease.

The facts demonstrate that Defendants filed a Change of Operator form with the KCC resulting in the KCC recognizing Defendants as the legally authorized operator of the Lease. This also resulted in the KCC cancelling a pending application for an injection well. In addition, Defendants contacted Coffeyville Resources, the crude oil purchaser, with documentation resulting in Coffeyville Resources changing the operator whom it recognized as controlling the sale of oil from the Lease from Cherokee Wells to JJR. As a result of Defendants' actions, the crude oil purchaser was confused with respect to whom was in charge of the Lease. Defendants do not dispute that they performed these actions.[32] These facts demonstrate that Defendants, as non-operators of the Lease, interfered with the operator Cherokee Well's conduct of an operation. In addition, Defendants did not own a majority interest in the Lease and therefore could not remove the operator. Accordingly, Plaintiffs are entitled to summary judgment as to Count I.

---

[32]The facts also demonstrate that Atkins shut-in the wells. As previously noted, Atkins disputes this proposition but does not provide support, so this fact is deemed admitted. However, even assuming that Atkins did not shut-in the wells, the other evidence cited above is sufficient to demonstrate that Defendants interfered with Cherokee Wells' operation of the lease.

With respect to Counts III and IV, Plaintiffs assert that Defendants have breached the contract by failing to pay joint interest and overhead charges. Defendants state that they do not owe HPP joint interest because HPP has no ownership in the lease. In addition, they assert that HPP and JJR had a gentleman's agreement allowing HPP to use JJR's equipment in return for not being billed overhead charges by Cherokee Wells.

As the Court has determined that HPP has title to the Lease, Defendants' argument that it owes no interest because HPP does not have ownership of the Lease is without merit. With respect to Defendants' contention that a gentleman's agreement exists as to the overhead charges, they have produced no evidence to support this contention.

The Court must interpret the contract provisions as written. The JOA requires JJR to pay its share of joint interest billing and overhead. The facts demonstrate that Defendants have not paid their joint interest billing since December 29, 2008 and have never paid any overhead charges. As such, Plaintiffs are entitled to summary judgment as to Count III and IV.

**C. Declaratory Judgment**

Plaintiffs contend that if the Court finds that they are entitled to summary judgment on Counts I through IV, the Court may enter the declaratory relief requested in paragraphs 80, 81, and 82 of their First Amended Complaint (part of Count VII). In those paragraphs, Plaintiffs request a declaratory judgment that (1) Cherokee Wells has the exclusive right to operate the Lease, and that neither JJR nor Atkins has the right to operate, manipulate, or otherwise control lease equipment; (2) that neither JJR nor Atkins has any right to interfere with Cherokee Wells' operation of the Lease, including, but not limited to, the sale of oil therefrom; and (3) that Cherokee Wells has the right to collect from JJR the share of overhead attributable to JJR's working interest in the Lease,

as the overhead is described in the JOA. The Court grants Plaintiffs' motion.

**D. Standstill Agreement and Preliminary Injunction**

With respect to the Standstill Agreement that the parties entered into, Plaintiffs state that if the Court quiets title to the disputed interest in HPP, then the Standstill Agreement should be terminated or otherwise dissolved. The Court grants Plaintiffs' request.

At the time Plaintiffs briefed their motion for summary judgment, there were no issues with the Standstill Agreement. Recently, Plaintiffs filed for a temporary restraining order and preliminary injunction on the basis that Defendants breached the Standstill Agreement. The Court granted Plaintiffs' request, and the details of the preliminary injunction are contained in another order.[33]

**IT IS ACCORDINGLY ORDERED** this 9th day of June, 2010 that Plaintiffs' Motion for Summary Judgment (Doc. 45) is hereby granted.

**IT IS SO ORDERED**.

/s Eric F. Melgren
ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[33]Doc. 97.