# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

HEAVY PETROLEUM PARTNERS, LLC,
and CHEROKEE WELLS, LLC,

    *Plaintiffs*,

vs.

PAUL ATKINS, an individual, and J.J.R. OF
KANSAS LIMITED,

    *Defendants.*

Case No. 09-1077-EFM

## MEMORANDUM AND ORDER

    This case involves a dispute between Plaintiffs Heavy Petroleum Partners, LLC (HPP) and Cherokee Wells, LLC and Defendants Paul Atkins and J.J.R. of Kansas Limited (JJR). Before the Court is Plaintiffs' Motion for Summary Judgment (Doc. 190). The issue is whether the Court should quiet title in Plaintiffs' favor. Because the Court finds that several issues of fact preclude the granting of summary judgment, the Court denies the motion.

### I. Factual and Procedural Background[1]

    In 1988, Defendant JJR's predecessor in interest, KLM Exploration Company, Inc., took an oil and gas lease from John and Sandra Zachariah in Jefferson County, Kansas. The lease covers approximately 240 acres. Through various assignments, JJR succeeded to the lessee's interest in the lease. The lease is underlain by the McClouth sandstone, a petroleum reservoir containing a very

---

[1] The Court will only give a brief background of the facts pertinent to the issues with respect to this motion for summary judgment.

dense, heavy crude oil.

On May 19, 2006, JJR and HPP entered into a farmout agreement (the Farmout) in which HPP was given the opportunity to earn 75% of JJR's working interest in the lease. Defendant Paul Atkins, owner of JJR, signed the Farmout. Several of the relevant contractual provisions will be set forth. Paragraph 2 of the Farmout states:

> **Test Pod:** On or before August 1, 2006, Farmoutee (HPP) shall from the Zachariah Pod # 1 (sometimes hereinafter referred to as "Test Pod"), and at its sole risk, cost and expense commence actual operations for the drilling of new wells and the reworking of existing wells to a depth of approximately 1,500 feet to inject steam into the McClouth Sandstone for the purpose of producing oil in commercial quantities. . . . Failure to commence operations as herein provided shall result in the termination of this agreement without penalty.

Paragraph 5 of the Farmout provides:

> **Assignment:** Farmoutor (JJR) agrees that when and if Farmoutee has timely and properly prosecuted the prescribed operations on the said Test Pod and has completed same as a facility capable of producing oil in commercial quantities, and if Farmoutee has otherwise complied with all of the terms and conditions contained herein, then Farmoutor will assign to Farmoutee, subject to the reservations and conditions contained herein, a 75% Working Interest and corresponding 62.625% Net Revenue Interest in and to the Oil and Gas Lease covering the Farmout Area as to all depths and all substances. . . . Any assignment made to Farmoutee hereunder shall be effective as of the date of this Farmout Agreement. As used herein, the term "Pod" is defined as an injection well and the producing oil wells assigned thereto. Unless otherwise provided by the KCC, each producing oil well shall have a drilling and spacing unit of 2.5 acres. Farmoutee agrees to accept the foregoing assignment of the Farmout Area subject to all the terms and provisions and conditions of the Oil and Gas Lease covering the Farmout Area. Farmoutee assumes and agrees to comply fully with and to perform timely each and every duty, obligation, provision and condition contained therein, both expressed and implied, insofar as they concern the Farmout Area. . . . Furthermore, Farmoutee agree[s] to maintain all Farmouter's production facilities and equipment in a good and workman like condition.

Robert Defeo, a member of HPP and a manager of Cherokee Wells, LLC, avers that HPP undertook development of the test pod and by August 2006, the test pod was capable of producing in *paying* quantities. On August 23, 2006, JJR executed an assignment (the Assignment) to HPP of 75% of the working interest in the lease. The Assignment was given an effective date of May 19, 2006–the same date as the date of the Farmout's execution. Mr. Defeo avers that steam injection into the test pod of wells did not commence until sometime after October 6, 2006, when the Kansas Corporation Commission (KCC) approved the permit to commence injection.

Paragraph 15 of the Farmout provides:

> If the Test Pod has been drilled and developed as hereinabove provided, Farmoutee shall have the option to contemporaneously drill and develop approximately 5,000 acres owned by Farmoutor in the area outlined . . . . Notwithstanding any of the remedies contained herein, should Farmoutee violate or fail to comply with any of the terms and provisions of this agreement, Farmoutor shall give Farmoutee written notice by certified mail of any violation of the agreement that has occurred and Farmoutee shall have thirty (30) days from the receipt of such notice in which to come into compliance with said agreement. Failure of Farmoutee to come into compliance with said agreement will result in the termination of said agreement in its entirety with all rights and interest in the Contract Area reverting to Farmoutor. In such event, Farmoutee agrees to assign to Farmoutor, within thirty (30) days from the date of termination of the agreement, all interest theretofore earned in the Contract Area.

The Farmout also included a Model Form Operating Agreement, often referred to as a joint operating agreement (JOA).[2] The JOA designated Blue Jay Operating as the operator of the lease. On December 31, 2006, Blue Jay Operating assigned all its rights and interests as operator of the lease to Plaintiff Cherokee Wells.

---

[2] The Court notes that Defendants object to this fact and states that Atkins never executed or agreed to this JOA. In Defendants' very next sentence, however, they state that "Paul Atkins did execute the JOA for JJR but did so to facilitate the plaintiffs' misrepresented rapid development reasons." *See* Doc. 194, p. 5, ¶ 23. Thus, the Court is left with Defendants' assertion that JJR did not execute the JOA and Defendants' assertion that Atkins executed the JOA on behalf of JJR. In any event, the Tenth Circuit previously determined that this Court properly found the JOA to be a binding contract. Thus, there is no dispute as to whether JJR is a party to the JOA.

In early January 2009, HPP noted diminished oil sales from the lease for the month of December 2008 and directed Atkins to concentrate on increasing production for the upcoming months. 300 barrels of oil from the lease sold during January, 2009. In early March 2009, HPP noticed that there were no oil sales from the lease for the month of February, 2009. Thus, HPP sent field personnel to the lease to investigate the causes of reduced production. HPP found that the wells on the lease had been shut-in.

On January 26, 2009, Mr. Atkins filed an affidavit of non-production regarding the lease in the official records of Jefferson County, Kansas. In this affidavit, Mr. Atkins stated: "Affiant further knows of own personal knowledge that there is at present no production of oil or gas in commercial quantities at this time and secondary recovery attempts have failed. Assignment and farmout agreement authorizing said assignment has expired by its own terms."

On or about February 5, 2009, Mr. Atkins filed a "Request for Change of Operator" form with the KCC designating JJR as the operator of the lease.   He also attached the affidavit of non-production to that form. As a result of the affidavit and filing with the KCC, the KCC approved the change of operator and cancelled a pending application for enhanced injection that Cherokee Wells had filed with respect to the lease. Mr. Atkins also contacted Coffeyville Resources requesting that the lease ownership be changed to reflect JJR as the operator and the owner of 100% of the working interest in the lease.  As a result of that contact, Coffeyville Resources changes its records to reflect JJR was the operator of the lease.

Plaintiffs filed their original complaint in this case on March 25, 2009 and asserted seven claims against Defendants, including claims for breach of contract and quiet title. Defendants counterclaimed for conversion and quiet title asserting that Plaintiffs had breached the Farmout. In

June 2010, this Court granted Plaintiffs' motion for summary judgment on most of their claims, including their quiet title claim finding that Plaintiffs were the owners of the 75% interest in the lease. In December 2010, the Court held a jury trial on the limited issue of whether Defendants breached their duty to pay amounts under the JOA. A jury found Defendants liable under the JOA in the amount of $87,387.03 for unpaid joint interest billing and unpaid overhead. The jury also determined that Defendants owed $155,239.36 for litigation expenses.

Defendants appealed to the Tenth Circuit Court of Appeals and raised five issues on appeal. The Tenth Circuit affirmed on some issues but found that this Court erred in granting summary judgment to Plaintiffs on the quiet title issue and should not have quieted title in Plaintiffs' favor. The Tenth Circuit found that the Assignment must be read in conjunction with the Farmout and remanded the case to this Court to redetermine the quiet title issue. The appellate court noted certain questions that this Court may need to consider. Plaintiffs again seek summary judgment and seek the Court's determination that title should be quieted in their favor.

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that "there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[3] The Court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party.[4] The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.[5] To meet this standard, the moving party need not disprove the nonmoving party's

---

[3] Fed. R. Civ. P. 56(a).

[4] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[5] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

claim; rather, the movant must simply point out the lack of evidence on an essential element of the nonmoving party's claim.[6]

If the moving party carries its initial burden, the party opposing summary judgment cannot rest on the pleadings but must bring forth "specific facts showing a genuine issue for trial."[7]  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[8]  Conclusory allegations alone cannot defeat a properly supported motion for summary judgment.[9]

### III. Analysis

Plaintiffs contend that they are entitled to summary judgment because (1) Defendant failed to comply with the notice-and-cure provisions of the Farmout, (2) in the alternative, the Farmout does not require HPP to continue to produce oil in commercial quantities as a result of steam injection in order to maintain HPP's interest in the lease, (3) in the alternative, Defendant permanently waived any requirement that production in commercial quantities be established from steam injection, and (4) any breaches asserted by Defendant are frivolous and do not give rise to a forfeiture of HPP's interest in the lease.

Before the Court can consider Plaintiffs' argument regarding Defendant's alleged failure to follow the notice-and-cure provision in Paragraph 15 of the Farmout, the Court must first consider certain threshold requirements regarding the Assignment set forth in paragraphs 2 and 5 of the

---

[6] *Id.* (citing *Celotex*, 477 U.S. at 325).

[7] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[8] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).

[9] *White v. York Int'l Corp.*, 45 F.3d 357, 363 (10th Cir. 1995).

Farmout.[10]  Paragraph 2 of the Farmout requires HPP, on or before August 1, 2006, to form a test pod and "commence actual operations for the drilling of new wells and the reworking of existing wells to a depth of approximately 1,500 feet to inject steam into the McClouth Sandstone for the purpose of producing oil in commercial quantities. . . . Failure to commence operations as herein provided shall result in the termination of the agreement without penalty."

Plaintiffs state that they *undertook development of the test pod* and by August 2006, the test pod was capable of producing in *paying* quantities.[11] As Paragraph 2 requires *commencing actual operations* for drilling wells to inject steam for the purpose of producing oil in *commercial quantities*, the Court finds that there is a question of fact as to whether Plaintiffs met the requirements of Paragraph 2.[12]  Because Paragraph 2 states that failure to commence operations as herein provided shall result in the termination of the agreement, this threshold question of fact needs to be determined.

---

[10] Plaintiffs contend that the Tenth Circuit established the following threshold criteria for Defendants' assertions that Plaintiffs' 75% interest in the Lease had been forfeited: "Defendants were not entitled to reassignment of a 75% working interest in the lease unless (1) Plaintiffs breached the farmout, (2) Defendants gave Plaintiffs notice of the breach by certified mail, and (3) Plaintiffs failed to cure the breach within thirty days." *See* Doc. 190, pp. 15-16 (citing the Tenth Circuit's opinion at Doc. 176, p. 20). While the Court agrees that the Tenth Circuit set forth this criteria, the Tenth Circuit also directed this Court to consider such issues as "whether Plaintiffs failed to 'commence operations,' and, if so, whether the lease terminated automatically." *See* Doc. 176, p. 21. Thus, the Court must first consider whether Plaintiffs earned the Assignment and if not, whether the lease terminated automatically pursuant to Paragraph 2.

[11] The Court notes that the Farmout appears to require Plaintiffs to develop test pod *capable* of producing oil in commercial quantities–not necessarily the requirement that it actually is producing oil in commercial quantities. In any event, as noted, there appears to be a question of fact as to whether the test pod was capable of producing oil in commercial quantities.

[12] "Paying quantities" may be the equivalent of "commercial quantities." The Court, however, was not given any argument or authority regarding this quesiton.

In addition, Paragraph 5 of the Farmout addresses the Assignment that Plaintiffs could earn. It provides that "*when and if* [HPP] has timely and properly prosecuted the prescribed operations on the said Test Pod *and has completed* same as a facility capable of producing oil in commercial quantities, *and* if [HPP] has otherwise complied with all of the terms and conditions contained therein, *then* [JJR] will assign to [HPP], subject to the reservations and conditions contained herein, a 75% Working Interest . . . in and to the Oil and Gas Lease covering the Farmout Area as to all depths and all substances." Paragraph 5 requires Plaintiffs to *complete* a facility *capable of producing oil in commercial quantities*. The evidence indicates that steam injection did not actually commence until on or after October 6, 2006; thus, it appears as if Plaintiffs did not meet the requirements of Paragraph 5. Yet, Defendants still executed the Assignment on August 23, 2006. Accordingly, Defendants may have waived the requirement that production in commercial quantities be established by steam injection.[13] "The question of waiver is one of fact or a mixed question of law and fact. Waiver must be manifested in some unequivocal manner by some distinct act or by inaction inconsistent with an intention to claim forfeiture of a right."[14] Thus, the Court finds that there is a question of fact as to whether Defendants waived any of the requirements in the Farmout.

Because there are several issues of fact, the Court cannot grant Plaintiffs' Motion for Summary Judgment.

---

[13] The question may also be whether Defendants waived the requirement that Plaintiffs complete a facility capable of producing oil in commercial quantities. As noted above, there is an initial question of fact as to whether Plaintiffs complied with Paragraph 2 of the Farmout and whether the Farmout automatically terminated.

[14] *Patrons Mut. Ins. Ass'n v. Union Gas Sys., Inc.*, 250 Kan. 722, 725-26, 830 P.2d 35, 39 (1992) (citation omitted).

**IT IS ACCORDINGLY ORDERED** this 23rd day of January, 2013 that Plaintiffs' Motion for Summary Judgment (Doc. 190) is hereby **DENIED**.

**IT IS SO ORDERED**.

*Eric F. Melgren*

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE