IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

HEAVY PETROLEUM PARTNERS, LLC,
and CHEROKEE WELLS, LLC

    *Plaintiffs,*

vs.

Case No. 09-1077-EFM

PAUL ATKINS, an individual, and J.J.R. OF
KANSAS LIMITED,

    *Defendants.*

**MEMORANDUM AND ORDER**

Plaintiffs Heavy Petroleum Partners, LLC, and Cherokee Wells, LLC, filed their original Complaint in this case on March 25, 2009, and asserted seven claims against Defendants Paul Atkins and J.J.R. of Kansas Limited, including claims for breach of contract and to quiet title. Defendants counterclaimed for conversion and also sought to quiet title. In June 2010, this Court granted Plaintiffs' motion for summary judgment on most of their claims, including their quiet title claim. In December 2010, the Court held a jury trial on the limited issue of whether Defendants breached their duty to pay under a contract. A jury found Defendants liable in the amount of $87,387.03.

Defendants appealed to the Tenth Circuit Court of Appeal, raising five issues.[1] The Tenth Circuit found that this Court erred in granting summary judgment in Plaintiffs' favor on the quiet title issue and should not have quieted title in Plaintiffs' favor. The Tenth Circuit remanded the case to this Court and noted several items that the Court may need to consider.

Upon remand to this Court, Plaintiffs again sought summary judgment on the quiet title issue, which the Court denied. On May 14, 2013, this Court presided over a bench trial on the quiet title issue and took the matter under advisement. The Court now makes the following findings of fact and conclusions of law, and for the reasons discussed below, enters judgment for Heavy Petroleum Partners, LLC, and Cherokee Wells, LLC and quiets title in their favor.

**I.     Findings of Fact**

In 1988, KLM Exploration Company, Inc., took an oil and gas lease from John and Sandra Zachariah in Jefferson County, Kansas. The lease covers approximately 240 acres, and it is located in the north half of the southeast quarter and the southwest quarter of Section 9, Township 9 South, Range 20 East, in Jefferson County, Kansas ("the Lease"). Through various assignments, Defendant J.J.R of Kansas Limited ("JJR") succeeded to the lessee's interest in the Lease.

On May 19, 2006, JJR and Plaintiff Heavy Petroleum Partners ("HPP") entered into a farmout agreement ("the Farmout") in which HPP was given the opportunity to earn 75% of JJR's working interest in the Lease under the terms expressed in the Farmout. Paul Atkins, principal owner of JJR, executed the Farmout on behalf of JJR. Paragraph 2 of the Farmout states:

---

[1] Notably, Defendants did not appeal the breach of contract claims determined by the jury to the Tenth Circuit.

**Test Pod:** On or before August 1, 2006, Farmoutee (HPP) shall from the Zachariah Pod # 1 (sometimes hereinafter referred to as "Test Pod"), and at its sole risk, cost and expense commence actual operations for the drilling of new wells and the reworking of existing wells to a depth of approximately 1,500 feet to inject steam into the McClouth Sandstone for the purpose of producing oil in commercial quantities. . . . Failure to commence operations as herein provided shall result in the termination of this agreement without penalty.

The McClouth Sandstone underlying the Lease contained a very dense, viscous crude oil, and the parties believed that the injection of steam might increase oil production from the Lease by both heating the oil to reduce its viscosity and using the resulting liquid water to push the oil toward producing wells nearby. A "pod" of wells, including the Test Pod, consists of a single steam injection well surrounded by several producing wells. Paragraph 2 of the Farmout identified the eight wells that constituted the Test Pod, including three wells (Zachariah 18, 19, and 20) that had not yet been drilled.

Paragraph 5 of the Farmout provides:

**Assignment:** Farmoutor (JJR) agrees that when and if Farmoutee has timely and properly prosecuted the prescribed operations on the said Test Pod and has completed same as a facility capable of producing oil in commercial quantities, and if Farmoutee has otherwise complied with all of the terms and conditions contained herein, then Farmoutor will assign to Farmoutee, subject to the reservations and conditions contained herein, a 75% Working Interest and corresponding 62.625% Net Revenue Interest in and to the Oil and Gas Lease covering the Farmout Area as to all depths and all substances. . . . Any assignment made to Farmoutee hereunder shall be effective as of the date of this Farmout Agreement. As used herein, the term "Pod" is defined as an injection well and the producing oil wells assigned thereto. Unless otherwise provided by the KCC, each producing oil well shall have a drilling and spacing unit of 2.5 acres. Farmoutee agrees to accept the foregoing assignment of the Farmout Area subject to all the terms and provisions and conditions of the Oil and Gas Lease covering the Farmout Area. Farmoutee assumes and agrees to comply fully with and to perform timely each and every duty, obligation, provision and condition contained therein, both expressed and implied, insofar as they concern the Farmout Area. . . . Furthermore, Farmoutee agree[s] to maintain all Farmouter's production facilities and equipment in a good and workman like condition.

Following execution of the Farmout, on May 30, 2006, HPP applied to the Kansas Corporation Commission ("KCC") for an Enhanced Recovery Injection Well Permit to operate the Zachariah 19 well as the steam injection well for the Test Pod. HPP commenced drilling the Zachariah 19 well sometime in June 2006. Drilling for this well was completed before July 20, 2006, when a gamma ray and cement bond log was run on the well. HPP started drilling the Zachariah 20 well on June 27, 2006, and commenced drilling the Zachariah 18 well on July 7, 2006. Both wells were completed as wells capable of producing oil in paying or commercial quantities on August 11, 2006. All other wells constituting the Test Pod were in existence prior to execution of the Farmout, and HPP performed any needed work and repairs to make them functional such that, as of August 11, 2006, the Test Pod had been complete as a facility capable of producing oil in commercial quantities by conventional means, but not by steam injection.

In an instrument dated July 26, 2006, JJR executed an assignment to HPP of 75% of the working interest in the Lease (the "Assignment"). The Assignment was given the effective date of May 19, 2006—the same date as the date of the Farmout's execution. Although the Assignment was dated July 26, 2006, JJR did not deliver the Assignment to HPP until August 23, 2006, the date on which Atkins' signature was acknowledged and on which the instrument was recorded in the official records of Jefferson County, Kansas. At the time JJR delivered the Assignment to HPP, steam injection had not commenced on the Test Pod, nor was the Test Pod capable of producing oil in commercial quantities due to steam injection.

At the time Atkins delivered the Assignment to HPP on behalf of JJR, Atkins was aware that the Test Pod was not capable of producing oil in commercial quantities due to steam injection. Atkins lived on the property and was actively involved in operations on the Lease

related to the Test Pod. Atkins also operated as the "pumper," a person who oversees day-to-day operations on an oil and gas lease.

The Zachariah 19 injection well (the steam injection well) was approved for injection by the KCC on October 6, 2006. Steam injection into the Test Pod commenced shortly thereafter. When injection commenced on the Zachariah 19 well, the Test Pod was completed as a facility capable of producing oil in commercial quantities due to steam injection. Records from the Kansas Geological Survey show that production from the Lease increased markedly in November 2006, the month after injection commenced on the Test Pod. The first six months of production from the Lease in the year 2007 was approximately twice the production rate frome the same period the prior year.

Once the Test Pod was fully completed in October 2006, Paragraph 6 of the Farmout required HPP to commence operations on a second pod of wells within 90 days. Under the same paragraph, JJR was given the option to participate in the costs of drilling and developing additional pods pursuant to the provisions of the joint operating agreement ("JOA"), attached to the Farmout as Exhibit C. Under Article VI of the JOA, JJR was required to pay its share (25%) of the costs to drill and develop each pod, or otherwise be subject to "non-consent penalties" that would have allowed HPP to recover 300% of its drilling costs before JJR would be entitled to any revenue from the pod. In anticipation of developing the second pod of wells, JJR and HPP entered into an amendment of the Farmout, dated August 29, 2006, which reduced the non-consent penalties under the JOA.

On November 8, 2006, approximately one month after injection commenced on the Test Pod, HPP commenced operations on the second pod of wells ("Pod 2") by filing an application with the KCC for an injection permit on the Zachariah 2-90 well, which was to be the injection

well for Pod 2. Pod 2 did not require the drilling of additional wells. The only operations necessary to develop Pod 2 were to convert the 2-90 to an injection well, workover existing wells in Pod 2, and obtain KCC approval to commence injection. Shortly after filing the November 8 application with the KCC, HPP commenced operations to convert the 2-90 to an injection well. HPP encountered difficulties in getting the 2-90 to pass it mechanical integrity test, which was a prerequisite for obtaining injection authority from the KCC. After multiple attempts, the 2-90 well passed the mechanical integrity test on June 6, 2007, and steam injection on Pod 2 commenced shortly thereafter. Following commencement of injection on Pod 2, oil production from the Lease climbed further, and 2007 saw the highest oil production from the Lease in 14 years.

Upon completion of Pod 2, Paragraph 6 of the Farmout gave HPP 180 days to commence operations on the next pod. If HPP failed to commence operation on a third pod, Paragraph 9 of the Farmout provided:

> It is agreed that at such time as Farmoutee (HPP) ceases to drill and develop Pods under Article VII herein, all lands not located within the 2.5 acres assigned to producing wells within the Pods shall be reassigned to Farmoutor (JJR) . . . .[2]

Prior to the time HPP was obligated to commence operations on a third pod of wells, HPP and JJR entered into an agreement, dated November 13, 2007, which amended Paragraph 6 of the Farmout by placing an "indefinite moratorium" on the development obligations therein. The amendment provided that "[a]t such time as either party desires to form more pods by drilling wells, injecting steam and produce [sic] oil, such operation shall be proposed under the terms and

---

[2] Paragraph 9 of the Farmout actually references Paragraph 7 [Article VII] of the Farmout, instead of Paragraph 6. However, the evidence demonstrated that this reference was a typographical error, and the parties intended to refer to Paragraph 6 [Article VI].

provisions of the Farmout Agreement as amended." Neither JJR nor HPP ever proposed operations for a third pod of wells.

On January 26, 2009, Atkins filed an affidavit of non-production regarding the lease in the official records of Jefferson County, Kansas. In this affidavit, Atkins stated: "Affiant further knows of own personal knowledge that there is at present no production of oil or gas in commercial quantities at this time and secondary recovery attempts have failed. Assignment and farmout agreement authorizing said assignment has expired by its own terms."[3]

Upon learning about the affidavit of non-production filed in January 2009, HPP understood it as a repudiation of its interest in the Lease and a repudiation of the Farmout. Paragraph 15 of the Farmout provided:

> If the Test Pod has been drilled and developed as hereinabove provided, Farmoutee shall have the option to contemporaneously drill and develop approximately 5,000 acres owned by Farmoutor in the area outlined . . . . Notwithstanding any of the remedies contained herein, should Farmoutee violate or fail to comply with any of the terms and provisions of this agreement, Farmoutor shall give Farmoutee written notice by certified mail of any violation of the agreement that has occurred and Farmoutee shall have thirty (30) days from the receipt of such notice in which to come into compliance with said agreement. Failure of Farmoutee to come into compliance with said agreement will result in the termination of said agreement in its entirety with all rights and interest in the Contract Area reverting to Farmoutor. In such event, Farmoutee agrees to assign to Farmoutor, within thirty (30) days from the date of termination of the agreement, all interest theretofore earned in the Contract Area.

JJR never sent HPP any written notice violation of the Farmout by certified mail as required by Paragraph 15 of the Farmout. JJR did send a letter to HPP, dated January 22, 2009,

---

[3] Atkins testified that his affidavit was addressing commercial quantities as it related to secondary recovery attempts (steam injection).

via overnight mail through the United States Postal Service. This letter stated, with respect to the Zachariah Lease:

> After years of playing around with the steam injection system trying to figure out what works for this type of oil, Jeff Morris came in and indicated that injecting fresh water or acid into this formation could damage it, and it has been shut off for some time. It is my view that the steam pod project has been a failure, and I'm sure you would agree. In the spirit of our farmout agreement, I am requesting the reassignment of the Zachariah lease to JJR of Kansas within the next 30 days.

The Lease produced in commercial quantities throughout HPP's ownership thereof. Production from the Lease continued until around March 24, 2009, when Atkins shut in, or turned off, substantially all of the wells on the Lease.

## II. Conclusions of Law

In this case, HPP acquired its 75% working interest in the Zachariah Lease through a written Assignment that must be read in conjunction with the written Farmout. This Court must decide whether title should be quieted in Plaintiffs' favor. A federal court sitting in diversity will apply the substantive rules of the forum state.[4]

### A. *The Farmout did not condition the Assignment on commercial quantities of oil solely on the basis of steam injection.*

JJR claims that the Farmout required HPP to establish actual production of commercial quantities of oil due solely to steam injection in order for HPP to earn the Assignment. JJR then claims that because the Test Pod was not capable of production of commercial quantities of oil due solely to steam injection at the time the Assignment was delivered, the Assignment was void from the beginning. Accordingly, JJR asserts that title should not be quieted in HPP's favor.

---

[4] *Cook v. Atchison, Topeka & Santa Fe Ry, Co.*, 816 F. Supp. 667, 669 (D. Kan. 1993). The parties do not dispute that Kansas law applies.

-8-

Resolution of the title question requires interpretation of written instruments. In Kansas, "[t]he primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the contract language without applying rules of construction."[5] If the contract is unambiguous, "a court must give effect to the intent of the parties as expressed within the four corners of the instrument."[6]

Paragraphs 2 and 5 are the pertinent provisions of the Farmout. Under Paragraph 5 of the Farmout, HPP was entitled to the Assignment if it "timely and properly prosecuted the prescribed operations on the said Test Pod" and "completed same as a facility capable of producing oil in commercial quantities" and otherwise complied with the terms of the Farmout. In Kansas, "commercial quantities" means "paying quantities."[7] "Paying quantities" means "production in such quantities as would pay a small profit over the cost of operating the well."[8]

The timeliness requirement in Paragraph 5 references the Test Pod discussed in Paragraph 2. Paragraph 2 of the Farmout states that "[o]n or before August 1, 2006, [HPP] shall form the Zachariah Pod #1 (sometimes hereinafter referred to as "Test Pod"), and at its sole risk, cost, and expense commence actual operations for the drilling of new wells and the reworking of existing wells . . . to inject steam into the McClouth Sandstone for the purpose of producing oil in commercial quantities." The evidence at trial demonstrated that this deadline was met because HPP began drilling wells in June 2006. In addition, the evidence at trial showed that all wells in

---

[5] *Carrothers Constr. Co. v. City of S. Hutchinson*, 288 Kan. 743, 751, 207 P.3d 231, 239 (2009).

[6] *Blair Constr., Inc. v. McBeth*, 273 Kan. 679, 691, 44 P.3d 1244, 1252-53 (2002).

[7] *Texaco Inc. v. Fox.*, 228 Kan. 589, 592, 618 P.2d 844, 847 (1980).

[8] *Reese Enterprises, Inc. v. Lawson*, 220 Kan. 300, 312, 553 P.2d 885, 896 (1976).

the Test Pod were capable of producing oil in paying or commercial quantities at the time Atkins delivered the Assignment on August 23, 2006.

Defendants, however, contend that the Test Pod had to be capable of producing oil in commercial quantities through steam injection alone in order for HPP to earn the Assignment. The plain language of the Farmout does not support Defendants' contention. Paragraph 5 does not reference steam injection. And Paragraph 2 simply states that HPP shall commence operations to drill and rework existing wells to inject steam for the purpose of producing oil in commercial quantities. Paragraph 2 does not state that the wells must be producing, by steam injection only, commercial quantities of oil in order for HPP to earn the Assignment.[9]

Because the evidence at trial demonstrates that the Test Pod was capable of producing oil in commercial quantities at the time of the Assignment, the Court finds that HPP satisfied the requirements to earn the Assignment when Atkins delivered it on August 23, 2006.

### B.  *Even if the Farmout conditioned the Assignment on commercial quantities of oil solely on the basis of steam injection, JJR waived this requirement.*

"Waiver in contract law implies that a party has voluntarily and intentionally renounced or given up a known right, or has caused or done some positive act or positive inaction which is inconsistent with the contractual right. Once it has been established that a contractual right has

---

[9] Defendants also contend that the Farmout required continuous commercial production due to steam injection in order for the Assignment to remain valid. The Court disagrees. As noted above, the Court finds that the Farmout does not require commercial production due to steam injection for the Assignment to be valid. And there are no provisions in the Farmout what would indicate a forfeiture of HPP's interest upon a subsequent failure to produce oil solely due to steam injection. *See, e.g., Bd. of Commr's of Okla. Cnty. v. Russell*, 174 F.2d 778, 781 (10th Cir. 1949) ("It is also universally recognized that courts abhor forfeitures and that all provisions providing therefor will be strictly construed and that forfeitures will not be decreed except when required by the clear language thereof.").
   Furthermore, even if the Farmout required commercial production of oil by steam injection, as will be discussed below, Defendants waived that requirement when they made the Assignment prior to the commencement of steam injection. *See Iola State Bank v. Biggs*, 233 Kan. 450, 459, 662 P.2d 563, 571-72 (1983) ("Once it has been established that a contractual right has been waived, a party possessing the contractual right is precluded from asserting it in a court of law.").

been waived, a party possessing the contractual rights is precluded from asserting it in a court of law."[10]

In this case, even if the Farmout required HPP to establish production of commercial quantities of oil due to steam injection for HPP to earn the assignment (as JJR contends), JJR waived this contractual provision. The evidence demonstrates that steam production did not actually commence in the Test Pod until October, 2006. Atkins was fully aware that the Test Pod was not capable of production in commercial quantities due to steam injection alone when he delivered the Assignment on August 23, 2006 to HPP. Atkins lived on the property and was actively involved in the Lease operations. Thus, to the extent that the Farmout might have required HPP to demonstrate that the Test Pod was capable of producing oil in commercial quantities as a result of steam injection in order to earn the Assignment, JJR waived that requirement when it knowingly made the Assignment several months prior to the commencement of steam injection.

For the above reasons, the Court concludes that the Assignment is a valid instrument transferring JJR's 75% working interest in the Lease to HPP, and HPP is entitled to judgment quieting title to its 75% interest in the Lease.[11]

---

[10] *Iola State Bank*, 233 Kan. at 458-59, 662 P.2d at 571-72.

[11] The Tenth Circuit noted two additional issues that this Court may need to address upon remand: (1) whether Defendants provided Plaintiffs proper notice regarding any actual breaches, and (2) whether, in light of Paragraph 9 of the Farmout, Plaintiffs are entitled to any interest in the lease beyond the first two pods. With respect to the first question, Defendants did not present any actual breaches by Plaintiffs during trial, and in any event, Defendants failed to provide Plaintiffs with the proper notice as required by Paragraph 15 of the Farmout of any alleged breach.
 With regard to the second question, Paragraph 9 provides that "at such time as [HPP] ceases to drill and develop Pods under Article [VI] herein, all lands not located within the 2.5 acres . . . shall be reassigned to [JJR]." A November 13, 2007 amendment to the Farmout suspended HPP's obligation under Paragraph 6 [Article VI] to drill and develop additional pods of wells after Pod 2. Thus, because Paragraph 9 would only require reassignment of a portion of HPP's interest upon failure to drill and develop under Paragraph 6 (and this obligation was eliminated), Paragraph 9 does not operate to reassign interest in the undeveloped portions of the lease to JJR.

### III. Miscellaneous Issues

#### A. *Jury verdict on breach of contract claim*

Defendants did not appeal the breach of contract claim (that the jury determined) to the Tenth Circuit. Upon appeal, however, the Tenth Circuit vacated the jury verdict apparently because it was premised upon the Court's previous finding (at summary judgment) that HPP owned the 75% working interest in the Lease. Because the jury verdict from the previous trial in December 2010 was predicated upon HPP's ownership of 75% interest of the Lease, and this Court has now determined that title should again be quieted in HPP's favor, the Court hereby reinstates the jury verdict from the previous trial awarding damages to HPP for unpaid operating expenses and overhead in the amount of $87,387.03.[12]

#### B. *Attorney's fees*

On appeal, the Tenth Circuit also vacated the award of attorney's fees because it determined that until this Court resolved the quiet title question, HPP could not be the "prevailing party" entitled to attorney's fees. In addition, the Tenth Circuit found that it was error for the issue of attorney's fees to be submitted to the jury. Because the Court quiets title in HPP's favor, the Court has again found that HPP is the "prevailing party." If HPP seeks attorney fees, HPP must file a motion for an award of attorney fees pursuant to Fed. R. Civ. P. 54(d).

#### C. *Noll Lease*

When this case was remanded to this Court, Defendant Paul Atkins raised the issue that when HPP executed upon its judgment, HPP allegedly improperly sold Atkins' personal interest

---

[12] *See LifeWise Master Funding v. Telebank*, 374 F.3d 917, 933 (10th Cir. 2004) (citing *Artis v. Hitachi Zosen Clearing, Inc.*, 967 F.2d 1132, 1138 (7th Cir. 1992) ("A judge 'continues to be bound by a jury's findings even it its verdict is vacated, so long as the underlying fact finding is not impugned.' ")).

in a 6.5% overriding royalty interest in an oil and gas lease ("the Noll Lease"). The Court will set forth a brief background of the facts surrounding this issue.

After the December 2010 jury trial and the Court's entry of judgment, HPP executed on its judgment. HPP applied for and received a Writ of Execution to execute on the property of JJR in order to satisfy the outstanding portion of the judgment. Although Defendants objected to the sale, and the case was on appeal to the Tenth Circuit, Defendants did not request a stay of execution on the judgment or post a supersedeas bond.[13] Thus, the Marshal's Sale was proper.

HPP executed upon the Noll lease during the Marshal's Sale, and the Marshal's Deed described the property as the following:

> All right, title, and interest of J.J.R. of Kansas Limited, believed to be a 0.06500000 overriding royalty interest, in a certain oil and gas leasehold arising from an oil and gas lease from Lloyd E. Noll and Norma E. Noll, as lessors, to Global Energy Solutions, Inc., as lessee, dated October 20, 1999, and recorded at Book 781, Page 576, of the official records of the Register of Deeds of Leavenworth County, Kansas, and Book 512, Page 43 of the official records of the Register of Deeds of Jefferson County, Kansas, covering the west half of the southwest quarter of Section 3, Township 9 South, Range 20 East, Leavenworth County, Kansas, and the northeast quarter of Section 9, Township 9 South, Range 20 East, Jefferson County, Kansas.

HPP contends that the plain language of the deed demonstrates that HPP did not execute on Atkins' property. Atkins contends that the interest in the property that HPP actually executed upon is his interest and not JJR's. Although the Court agrees that the plain language of the Marshal's Deed states that the execution only applies to property of JJR, the plain language of the deed does not appear to resolve the factual question of whether this property is in fact JJR's interest or Atkins' interest.

---

[13] *See* Fed. R. Civ. P. 62.

With respect to the legal issue, both parties are in agreement that HPP has no right to execute on Atkins' personal property because Atkins is excluded from personal liability regarding the money judgment. HPP specifically states that it did not intend that the Marshal's Deed it obtained should convey any interest owned by Atkins personally, or any interest in the Noll-Atkins lease. Thus, there is no dispute that HPP cannot (or could not) execute upon Atkins' personal property.

There is, however, a factual dispute as to whether the property covered by this lease is JJR's or Atkins' property. The resolution of this title issue is not clear from the parties' submissions on the issue.[14] Thus, the Court gives the parties 60 days to reach an agreement as to the title issue.[15] If the parties cannot come to an agreement, the Court will appoint a special master to render a title opinion, and the non-prevailing party on that issue will be assessed all costs associated with the rendering of the title opinion.

**IT IS ACCORDINGLY ORDERED** this 23rd day of July, 2013, that judgment should be entered in favor of Heavy Petroleum Partners, LLC and Cherokee Wells, LLC and the Court quiets title in their favor.

**IT IS SO ORDERED**.

*[signature]*
ERIC F. MELGREN
UNITED STATES DISTRICT COURT

---

[14] The Court does not wish to delve into another title issue, but if the property that was executed upon actually belongs to Atkins and should not have been executed upon, Atkins is entitled to relief.

[15] The Court recognizes that the parties disagree on the issue as it now stands, but the Court encourages the parties to attempt to come to a resolution. The Court cautions Defendants that they are *not* pursuing a fraud claim, and Defendants should cease characterizing the issue as one for "premeditated fraud." There simply is a factual question surrounding the property.